**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **MARSHELLE HIGHTOWER**<br>**Sicklerville, NJ 08081**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**INGERMAN MANAGEMENT COMPANY**<br>**5 Powell Lane**<br>**Collingswood, NJ 08108**<br><br>**and**<br><br>**BRAD INGERMAN**<br>**Radnor, PA**<br><br>**Defendants.** | **CIVIL ACTION NO. 17-8025**<br><br>**JURY TRIAL DEMANDED** |

**SECOND AMENDED COMPLAINT**

## I. INTRODUCTION

Plaintiff, Marshelle Hightower, brings this action against her former employer, Ingerman Management Company ("Corporate Defendant"). Plaintiff, a high-performing employee of Corporate Defendant, and the only black and female member of its corporate executive leadership team, was terminated based on her sex and her race, and as a result of her expressed opposition to Corporate Defendant's discriminatory comments and conduct, including racist and sexist comments that were made by the company's highest-level executives.

Corporate Defendant discriminated against Plaintiff based on her sex and her race, and retaliated against her based on her complaints about its

discriminatory conduct, in violation of 42 U.S.C. §1981 ("Section 1981") and the New Jersey Law Against Discrimination, as amended, N.J.S.A. 10:5-1, *et seq.* ("NJLAD"). Defendant Brad Ingerman ("Defendant Ingerman"), who is Corporate Defendant's Chief Executive Officer ("CEO"), aided, abetted, incited, compelled and/or coerced Corporate Defendant's discriminatory and retaliatory conduct, in violation of the NJLAD.

## II. PARTIES

1. Plaintiff, Marshelle Hightower, is an individual and a citizen of the state of New Jersey.

2. Plaintiff is female.

3. Plaintiff is black.

4. Corporate Defendant is a Pennsylvania corporation with a principal place of business at 5 Powell Lane, Collingswood, NJ 08108.

5. Corporate Defendant is engaged in an industry affecting interstate commerce and regularly does business in the state of New Jersey.

6. Upon information and belief, Defendant Ingerman is an individual and citizen of the state of New Jersey.

7. At all times material hereto, Defendant Ingerman was, and continues to be, in the position of CEO at Corporate Defendant.

8. At all times material hereto, Corporate Defendant acted by and through its authorized agents, servants, workmen, and/or employees acting within the course and scope of their employment with Corporate Defendant and in furtherance of Corporate Defendant's business.

9. At all times material hereto, Corporate Defendant acted as an employer within the meaning of the statutes which form the basis of this matter.

10. At all times material hereto, Plaintiff was an employee of Corporate Defendant within the meaning of the statutes which form the basis of this matter.

## III. JURISDICTION AND VENUE

11. The causes of action which form the basis of this matter arise under Section 1981 and the NJLAD.

12. The District Court has jurisdiction over Count I (Section 1981) pursuant to 28 U.S.C. §1331.

13. The District Court has supplemental jurisdiction over Count II (NJLAD) pursuant to 28 U.S.C. §1367.

14. Venue is proper in the District Court under 28 U.S.C. §1391(b).

## IV. FACTUAL ALLEGATIONS

15. Plaintiff was hired by Corporate Defendant as Human Resources ("HR") Director in or about September 2015. She reported directly to Marty Josephs (white, male), President, Property Management Division. Plaintiff also had reporting relationships to Defendant Ingerman (white, male); David DeAugustine (white, male), Chief Financial Officer; and, Edward Coupe (white male), President, Construction Division.

16. At all times material hereto, Plaintiff performed her duties in a highly competent manner. She was never disciplined regarding any performance-related issues.

17. Corporate Defendant's demographics evidenced a bias against female and black employees. Evidence of the same includes, but is not limited to the following:

(a) At the time of Plaintiff's hire, Corporate Defendant's corporate executive leadership team was comprised entirely of white males;

(b) With Plaintiff's termination, Corporate Defendant's corporate executive leadership team was comprised entirely of white males;

(c) Corporate Defendant's second-level of management was dominated by males and white employees; and,

(d) To the best of Plaintiff's knowledge, she was the first black female to be part of the corporate executive leadership team.

18. During Plaintiff's employment, Defendant's high-level managers engaged in sex discriminatory, and race discriminatory, comments and conduct. The same included, but was not limited to, the following:

(a) In or about December 2015, Corporate Defendant held its year-end meeting, which included a slide presentation to the entire company. The presentation included sexually suggestive comments and pictures, including, but not limited to:

(1) A picture of Defendant Ingerman at the podium with the caption, "Pregnancies have gotta go," and then, under that, a caption, "Marshelle's Worst Nightmare";

(2) A picture of the employees who were pregnant in 2015 accompanied by discussion of the time that they took off for maternity leave and the negative impact that it had on the business;

(3) A picture of a man with what appears to be an erect penis (showing through his pants) with the caption, "Oh My – He's Really Excited About The Conference";

(4) Pictures of female employees holding balloons up to their chest (which occurred during a team-building session that was part of the mid-year conference) with captions including, "What a nice set"; "That's quite a pair"; "If you got it flaunt it girlfriend!!"; "I want mine big like these," "Mary's are bigger"; and, "Mary, you're a little lopsided…" with the caption, "Somebody Call Maintenance An Adjustment Is Needed"'

(5) A picture of a man holding something in front of his body, with the caption, "OHSHA Safety Training – Protecting The Family Jewels…"; and,

(6) A picture of a man pointing to another man's genital area with the caption, "Look, I Found It!!!"

(b) In or around early 2016, upon Plaintiff's information and belief, Defendant Ingerman disagreed with a female employee's opinion regarding a work-related issue and told her that, "This isn't a woman issue, it's a business issue. Go burn your bra somewhere else";

(c) In or about May 2016, upon Plaintiff's information and belief, Josephs said to a black female candidate whom he was interviewing for an open position that, "I didn't know there were any black people left in the state of West Virginia";

(d) Josephs told Plaintiff that, if a female director-level employee could only get a man and "get laid," she would be in a better position to handle a particular issue;

(e) Corporate Defendant put on a presentation at its year-end meeting in December 2016 that included the following sexually suggestive

comments and pictures:

(1) A picture of a female vendor wearing a belt with the letter "D" on the buckle with the caption, "Shouldn't That Belt Have DD?" referencing her breast size;

(2) DeAugustine saying to the female receptionist, "Kris, Where's The Lotion?"

(3) A picture of the female receptionist with a male employee saying, "Kris, I still need that ointment," with the caption,

(4) A picture of one of the female managers holding a hammer and captioned, "Who Wants To Get Pounded?"

(5) A picture of a female employee holding up a die turned to the side with six (6) dots on it with the caption, I Like ~~Sex~~ Six!" and a male employee looking in the woman's direction saying, "Me Too..."

(f) In around early March 2017, Josephs informed Plaintiff that he planned to terminate a black, female Regional Manager for performance-related issues. When Plaintiff asked Mr. Josephs his justification for terminating the black, female manager, as that manager had received the same overall performance score as her white, male counterparty, he told Plaintiff that the (black, female) manager "just didn't get it" and that he had received complaints about her from her direct reports;

(g) Plaintiff reminded Josephs that Corporate Defendant had received complaints about the white, male manager from his direct reports, and asked why he was only considering terminating the black female manager and not the white male manager. Plaintiff told Josephs that the managers were being treated differently based on their race and sex;

(h) Josephs then decided that he would not terminate the black, female manager, but, instead, he demoted her, decreased her pay, and transferred the majority of her responsibilities to (white) employees. To the best of Plaintiff's knowledge, Corporate Defendant did not take any action against the white, male manager with performance issues;

(i) In or around February 2017, in a discussion about the Women's March the day after President Trump's inauguration in January 2017 as well as the upcoming Day Without Women in March 2017, DeAugustine said, in front of Plaintiff and Josephs, that he told his team that he would fire anyone who called out that day "right on the spot." Plaintiff told both DeAugustine and Josephs that, if they did so, there would be lawsuits regarding the same;

(j) In or around early 2017, Plaintiff was in a meeting with Defendant Ingerman, Josephs, and DeAugustine when Ingerman said that he did not recognize a black employee who had changed her hairstyle because "they change their hair so much," and that she needed to leave it as it was before (straightened and relaxed rather than wearing it natural, to which she had just changed it) because it was presentable;

(k) In or around early March 2017, Plaintiff learned that Josephs was interviewing a black female candidate for an open property manager position and asked her how she would react if someone came up to her and said, "Hey, bitch, I want an apartment now";

(l) When Plaintiff told Josephs that his question was Inappropriate, his response was that the candidate needed questions about real-

life scenarios. When Plaintiff again told him that his question was inappropriate, Josephs shrugged and walked away from her. Corporate Defendant selected a white male (who was not asked a similar "real-life scenario" in his interview) to fill that position;

(m) In or about March 2017, Josephs told a black female manager in a meeting, "As black as you are, you just turned as white as a sheet of paper."

19. As detailed below, Plaintiff made numerous complaints regarding Corporate Defendant's sex discriminatory and race discriminatory conduct. Corporate Defendant failed to take appropriate remedial and/or corrective action regarding Plaintiff's complaints, but, rather, retaliated against Plaintiff.

20. After the December 2015 presentation, in which Corporate Defendant included inappropriate, sex-based comments and pictures, Plaintiff told Corporate Defendant that the slides were completely inappropriate, that it was a lawsuit waiting to happen, and that she had received complaints from multiple employees about the sexual nature of the presentation.

21. Josephs and DeAugustine admitted that they went overboard in the presentation, and they told Plaintiff that they would include her in the preparation of the same the following year.

22. In around March 2016, Plaintiff saw DeAugustine embracing one (1) of his female direct reports outside of the office. She immediately advised Josephs of the same, and told DeAugustine that they needed to discuss that issue.

23. Josephs told Plaintiff that Corporate Defendant had already spoken with DeAugustine regarding the fact that there were rumors of a sexual and/or romantic relationship between him and that female subordinate, and that he needed to cease any personal relationship with that employee. Josephs also instructed Plaintiff not to disclose what she had seen between DeAugustine and his female subordinate to Defendant Ingerman. Although Plaintiff objected to Josephs' instruction to keep that information from Defendant Ingerman, he again warned her not to tell Ingerman about what she had seen.

24. When Plaintiff spoke with DeAugustine on the following day, he admitted that he was having an inappropriate personal relationship with his female subordinate, but said that he would engage in a strictly professional relationship with her going forward.

25. In or around August 2016, Plaintiff again saw DeAugustine with his same female subordinate and in a manner which suggested that he was still engaged in an inappropriate relationship with her. When Plaintiff again reported the same to Josephs, he told her to drop it.

26. When Plaintiff told Josephs that Corporate Defendant should not drop that issue, and that DeAugustine's inappropriate conduct with his female subordinate was impacting his work group, as well as other employees' perceptions of that female subordinate, he warned her that she was to let it go.

27. Prior to Defendants' December 2016 year-end meeting, Plaintiff asked to see senior management's presentation regarding the same, as she was concerned about the sexually inappropriate content that the company had

included in the prior year's presentation.

28. Corporate Defendant denied her requests, and said that she was going to take the "fun" out of everything because she would "edit" the presentation. Plaintiff said that, if Corporate Defendant included inappropriate content, as it did in the 2015 presentation, then she would remove the same.

29. On the day before the conference, Plaintiff again asked to see Corporate Defendant's presentation, so that she could make sure that there was no inappropriate or discriminatory content included in the same. Once again, Corporate Defendant denied her request. Josephs told her that it was "not as bad" as the prior year's presentation, but that they still needed to "have some fun."

30. After the December 2016 presentation, which included sexually inappropriate content, as set forth above in Paragraph 18(e), Josephs asked Plaintiff what she thought of the same. Plaintiff told him that it was a problem, as it contained inappropriate messages and pictures. Josephs brushed aside Plaintiff's expressed opposition to the discriminatory nature of the presentation.

31. On or about March 23, 2017, Corporate Defendant told Plaintiff that her employment was terminated. She was told that the effective date of the same was April 23, 2017, so that she could transition her responsibilities.

32. Plaintiff was told that the reason for her termination was that Corporate Defendant was not "comfortable" with the direction of the HR Department; that Josephs, DeAugustine, and Defendant Ingerman had lost confidence in her; that Josephs was unhappy regarding the execution of certain

issues; and, that some of the objectives for HR for 2016 had not been met.

33. Corporate Defendant's asserted reason for Plaintiff's termination was pretextual.

34. To the best of Plaintiff's knowledge, Corporate Defendant has hired a white, male employee to replace her, and has given that white, male employee the title of Vice President, which is a higher level than Plaintiff's director title.

35. On or about April 11, 2017, Corporate Defendant became aware that Plaintiff was making complaints that she had been subjected to race and sex discriminatory conduct, and retaliation based on her opposition to Defendant's discriminatory conduct.

36. On or about April 13, 2017, when Plaintiff came in to work, she was told that that was her last day with the company.

37. On that same day, Plaintiff received an email from Defendant Ingerman, copying Ronen Mitra (male), General Counsel; Josephs; and, DeAugustine, which read as follows:

> Marshelle:
>
> While I was disappointed at receiving the "lawyer letter" relating to your employment, it certainly was not unexpected. It's quite sad these days that so many times when an employee is just not during their job to a satisfactory level they try and "cloak" their dismissal as being retaliatory and as a result of age, race, sex or some other type of discrimination. While there may be cases where that is justified, you know better than anyone that is NOT the case here. As your lawyer stated in his letter, when we were making a decision to hire a new HR director we had you (an African American female) and a white guy as our finalists. Who did we choose to hire-the African American female. Not because of the color of your skin or your

> gender but because we felt you were the best qualified for the job at that time-period the end.
>
> I take the threat of a lawsuit on your part very personally. I will NOT settle your case. I am prepared to spend whatever I have to because I know the truth and the truth is not what you told your counsel as you wanted to paint a picture of 'big bad Ingerman". The truth is you were given every opportunity to succeed and you constantly disappointed me and others. I wanted to terminate you when you failed to advise me of your actions in terminating our benefits broker and directly chose to not follow our counsel's advice. I also wanted to terminate you when on several occasions I asked you to provide me essential HR related information and in both cases I subsequently had to remind you that you failed to do so 2 weeks and almost a month later.
>
> Marshelle take a good look in the mirror and you will see why you were terminated. Of our 300+/- employees the lion's share are either women or persons of color. How dare you play the race card here. If any one of our many hundred employees get the job done we do not care what race, religion, ethnicity, etc. they are. We hire and try to keep the best employees plain and simple.

38. On or about April 20, 2017, Plaintiff filed her first Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), complaining about Defendants' sex and race discriminatory conduct, and its retaliatory conduct based on her complaints about the same.

39. In or around June 2017, Corporate Defendant appealed Plaintiff's award of unemployment compensation.

40. To the best of Plaintiff's knowledge, and during the course of her employment with Corporate Defendant, Corporate Defendant appealed an employee's award of unemployment compensation in rare circumstances and

only when an employee had been informed, in writing, regarding clear violations of company policy.

41. Plaintiff defeated Corporate Defendant's appeal of her award of unemployment compensation.

42. Corporate Defendant has indicated that it is filing an appeal of the Decision of the Appeal Tribunal upholding Plaintiff's award of unemployment compensation to the Board of Review.

43. The Unemployment Compensation Board of Review denied Corporate Defendant's appeal of Plaintiff's award of unemployment compensation.

44. Plaintiff's sex was a motivating and/or determinative factor in Defendants' discriminatory treatment of Plaintiff, including the hostile work environment to which Plaintiff was subjected, and the termination of Plaintiff.

45. Plaintiff's race was a motivating and/or determinative factor in Defendants' discriminatory treatment of Plaintiff, including the hostile work environment to which Plaintiff was subjected, and the termination of Plaintiff.

46. Plaintiff's complaining of sex discrimination and race discrimination was a motivating and/or determinative factor in Defendants' retaliatory treatment of Plaintiff, including the hostile work environment to which Plaintiff was subjected, the termination of Plaintiff, and Defendant's appealing Plaintiff's awards of unemployment compensation.

47. Defendants failed to prevent or address the discriminatory and retaliatory conduct referred to herein and further failed to take corrective and

remedial measures to make the workplace free of discriminatory and retaliatory conduct.

48. The retaliatory actions taken against Plaintiff after she complained of discriminatory conduct would have discouraged a reasonable employee from complaining of discrimination.

49. The discriminatory and retaliatory conduct of Defendants, as alleged herein, was severe and/or pervasive enough to make a reasonable person believe that the conditions of employment had been altered and that a hostile work environment existed, and made Plaintiff believe that the conditions of employment had been altered and that a hostile work environment existed.

50. As a direct and proximate result of the discriminatory and retaliatory conduct of Defendants, Plaintiff has in the past incurred, and may in the future incur, a loss of earnings and/or earning capacity, loss of benefits, pain and suffering, embarrassment, humiliation, loss of self-esteem, mental anguish, and loss of life's pleasures, the full extent of which is not known at this time.

51. Defendants acted with malice and/or reckless indifference to Plaintiff's protected rights.

**COUNT I – Section 1981**

52. Plaintiff incorporates herein by reference paragraphs 1 through 51 above, as if set forth herein in their entirety.

53. By committing the foregoing acts of race discrimination and retaliation based on Plaintiff's complaints of Defendant's race discriminatory conduct, Defendant has violated Section 1981.

54. Said violations were done with malice and/or reckless indifference, and warrant the imposition of punitive damages.

55. As a direct and proximate result of Defendant's violation of Section 1981, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

56. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

57. No previous application has been made for the relief requested herein.

**COUNT II – NJLAD – Corporate Defendant**

58. Plaintiff incorporates herein by reference paragraphs 1 through 57 above, as if set forth herein in their entirety.

59. Defendant, by the above improper and discriminatory and retaliatory acts, has violated the NJLAD.

60. Said violations were intentional and willful.

61. As a direct and proximate result of Defendant's violation of the NJLAD, Plaintiff has sustained the injuries, damages, and losses set forth herein and has incurred attorney's fees and costs.

62. Plaintiff is now suffering and will continue to suffer irreparable injuries and monetary damages as a result of Defendant's discriminatory and retaliatory acts unless and until the Court grants the relief requested herein.

63. No previous application has been made for the relief requested herein.

**COUNT III**
**NJLAD – Defendant Ingerman**

64. Plaintiff incorporates herein by reference paragraphs 1 to 63 above, as if set forth herein in their entirety.

65. Defendant Ingerman willfully and knowingly aided, abetted, incited, compelled and/or coerced Corporate Defendant in the discriminatory and retaliatory conduct to which Plaintiff was subjected.

66. Defendant Ingerman knowingly gave substantial assistance and/or encouragement to the unlawful acts of harassment, discrimination and retaliation of Corporate Defendant towards Plaintiff.

67. Defendant Ingerman, by the foregoing acts of discrimination and retaliation, has violated the NJLAD.

68. Said violations were intentional and willful.

69. As a direct and proximate result of Defendant Ingerman's violations of the NJLAD, Plaintiff has sustained the injuries, damages and losses set forth herein.

70. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant Ingerman's discriminatory and retaliatory acts unless and until the Court grants the relief requested herein.

71. No previous application has been made for the relief requested herein.

## RELIEF

WHEREFORE, Plaintiff seeks damages and legal and equitable relief in connection with Defendants' improper conduct, and specifically prays that the Court grant the following relief to the Plaintiff by:

(a) declaring the acts and practices complained of herein to be in violation of Section 1981;

(b) declaring the acts and practices complained of herein to be in violation of the NJLAD;

(c) enjoining and permanently restraining the violations alleged herein;

(d) entering judgment against the Defendants and in favor of the Plaintiff in an amount to be determined;

(e) awarding compensatory damages to make the Plaintiff whole for all lost earnings, earning capacity and benefits, past and future, which Plaintiff has suffered or may suffer as a result of Defendants' improper conduct;

(f) awarding compensatory damages to Plaintiff for past and future pain and suffering, emotional upset, mental anguish, humiliation, and loss of life's pleasures, which Plaintiff has suffered or may suffer as a result of Defendants' improper conduct;

(g) awarding punitive damages to Plaintiff under Section 1981;

(h) awarding punitive damages to Plaintiff under the NJLAD;

(i) awarding Plaintiff such other damages as are appropriate under Section 1981 and the NJLAD;

(j) awarding Plaintiff the costs of suit, expert fees and other disbursements, and reasonable attorney's fees; and,

(k) granting such other and further relief as this Court may deem just, proper, or equitable including other equitable and injunctive relief providing restitution for past violations and preventing future violations.

**CONSOLE MATTIACCI LAW, LLC**

Dated: January 16, 2018

BY: ______________________

Stephen G. Console (36656)
Caren N. Gurmankin (205900)
110 Marter Avenue, Suite 502
Moorestown, NJ 08057
(856) 854-4000

Attorneys for Plaintiff,
Marshelle Hightower